Case number 253765, Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation, et al. Argument not to exceed 15 minutes for appellant, with 15 minutes to be shared by appellees. Mr. Markovits, you may proceed for the appellant. Good morning, Your Honors. Bill Markovits on behalf of the Ohio Public Employees Retirement System. I'd like to reserve three minutes for rebuttal. Fine. And those errors have compounded at each stage. At the pleading stage, the district court rejected the well-accepted materialization of the risk theory of loss causation. On remand, after this court reversed at the class certification stage, the district court made numerous pure legal errors. One of those, the rejection of the price maintenance theory of price impact, foreclosed OPERS from moving forward and was case dispositive. Why did it foreclose? So I totally agree with you that the price maintenance theory is a valid theory. But at the class certification, she said it proves too much. And then she points out a couple times that at page 28 of R-596, she says that the price maintenance wasn't precluded. You could have re-raised it. And she points that out again a couple times in the summary judgment motion. Because that isn't binding. Class cert has nothing to do with the ultimate summary judgment. So you could have raised it again. No, because she clearly and repeatedly precluded it, Your Honor. She precluded it in the initial decision, price maintenance. And then at sua sponte summary judgment, at the first summary judgment, if you will, she indicated the court, based on defendant's argument, has followed these cases that reject price maintenance as a viable theory of price impact, period. So she rejects it again. That's why we were up here last time on summary judgment. At that summary judgment, if you recall, the opinion invited the district court to revisit various issues, including the rejection of price maintenance. We went back down, and now on the second summary judgment, we raised that point in our omnibus opposition to summary judgment, that invitation. She declined it. She specifically noted in her most recent opinion that invitation by the Sixth Circuit. But she didn't adopt price maintenance. She continued to reject price maintenance. That was a repeated ruling on a rejection of a theory, which was the sole theory of price impact raised by OPRS. And I think at one point... As in her summary judgment, defendants correctly note, however, that a class certification decision does not preclude a plaintiff from offering competent evidence at summary judgment. After all, and then she goes on to say that it just granted or denied class cert. So it seems to me it was incumbent on you to then present both the damages as a result of the price maintenance theory and the price maintenance theory, again, because she's saying, I haven't definitively ruled on it, basically. But she did, repeatedly. At one point, she suggested we could raise some evidence of it, but she had precluded that. You can't raise evidence of price maintenance. The price maintenance theory was our only theory of price impact. In certain situations, there could be other theories of price impact. In our case, there wasn't. Once she rejected that as a matter of law, which she repeated again and again and again, it's not incumbent on us to manufacture evidence that's contrary to her rulings. She did not reconsider that ruling. That's the way a securities case is staged. You have the class certification decision on... Don't you agree she said it proves too much? What does that mean? Frankly, Your Honor, I have no idea what it means. When she said that, she also cited In re Credit Suisse for the idea that that theory was patently invalid. And then in her subsequent opinion... The SDNY case? Yes. And then in her subsequent, again, in her subsequent sua sponte, she said, the defendants proposed this argument, I accepted it, rejecting price maintenance as a viable theory. And that had a cascading effect. The rejection of price maintenance prevents price impact, which in turn prevents loss causation and damages, and prevents Comcast, because Comcast is based on the idea that your theory is consistent with class-wide damages, and the only theory we have is price maintenance. So if we accept that you have preserved the right to argue price maintenance, what is the scope of your argument in front of us? Well, the scope of the argument in front of you, among the many errors, it should... that price maintenance, again, had this cascading effect. It clearly precluded class certification, among the other errors involving camera factor 5 and semi-strong efficiency and others. It precluded class certification, but then it went on to preclude our case moving forward at summary judgment. And so what should happen is the correct law and the correct legal standards should be applied, the class certification decision should be reversed for its many, many errors, the summary judgment decision should be reversed for the same reason, and the case should be remanded so that those decisions can be made, not consistent with outlier decisions that have been rejected by the circuit, but consistent with applicable law. Let me... she ruled against you on five different things, the way I count it, and I could be counting wrong, but one of the critical ones is reliance, and as your friend on the other side points out, you don't raise reliance in your opening brief, which under our Kuhn case means you waive the right, and if you lose on reliance, you lose the case. Why isn't that determinative? That's not determinative, Your Honor, because... for a variety of reasons. The specific reliance determination wasn't raised in our brief because it's derivative. It's derivative of her decisions on camera factor five, the improper exclusion of the Feinstein opinion in totality, the use of semi-strong efficiency, reverse those, and we meet the basic presumption of reliance, which as in any institutional investor-type securities for our cases, what you rely on. Why do you have to argue that in your opening brief? It is one of the five reasons, and you agree independently if you lose on reliance, you lose the case. It's a derivative ruling, Your Honor. Here's the situation we face, and... You could argue that about everything. I mean, you could argue that if the price impact is arguably derivative, or price maintenance, I'm sorry, or impact, whatever you want to call it, but is arguably derivative of you first have to have false statements, and if you don't have those, then that's irrelevant, right? So everything, I mean, that's how it works. This is more directly derivative. The specific issues we challenged, putting camera factor five as dispositive, rejecting or requiring semi-strong efficiency, excluding the totality of Feinstein's opinion, the common sense, saying there's no market efficiency in a case with Fannie Mae common stock, which our experts basically said that's a no-brainer. It has to trade in an efficient market. She found otherwise because she applied the incorrect standards, reversed the incorrect application of the standards, and there's the basic presumption of reliance. It's a downstream effect. And in terms of the waiver, and that's in part why we filed a 28-J with a more recent Smith v. City of Union and Aaron v. King case, which basically say, look, first of all, it's not a waiver. There was no knowing relinquishment. I don't think it's a waiver or forfeiture because, again, it's just a downstream direct consequence. Reverse those rulings, we get reliant. Do you have a case for that? I mean, I agree with you. It's probably forfeiture, not waiver. I think our court and parties mix that up all the time. But Coon says waiver for whatever reason. But what's the case for the proposition that you don't have to raise necessary arguments that are downstream? Well, I think there's the Smith v. City of Union and Aaron v. King both point that out. This is a situation where, at most, it's forfeiture. And in the case of forfeited issue, you've got a forfeited issue that's purely legal. And, again, I don't even think it's either because it's a downstream effect. But Smith v. City of Union and Aaron v. King talk about issues, raises related or supporting arguments in its briefing. The camera factor 5, semi-strong efficiency, Feinstein total exclusion, those are not only related or supporting. I mean, again, reverse those, you have the basic presumption of  We have here, the court may recall, Judge DePard may recall he was on the prior panel. We have here of the Kammerer and Krogman factors, we have all but the court held this positive. We have a trading, a common stock trading on the New York Stock Exchange. We have a common stock trading at a volume of 3% when the case law says 2% gives a strong presumption. Reverse the erroneous rulings and we have the basic presumption of reliance. And, in terms of forfeiture, many of the cases, the Smith case, the There are no prudential concerns here. It was fully briefed below. There's no surprise. There's no sandbagging. Everybody knows we're going with the basic presumption of reliance. What happened at this initial brief, frankly, is there was a structural concern on our part because we not only on this second go-round had to deal with the many, many issues we dealt in the prior appeal from the class certification and sui sponte summary judgment, but in addition, issues relating to scienter, materiality, falsity, loss causation and  So we have to deal with all these issues. What we determined was to challenge the objects that were casting the shadow, not the shadow. Can I ask you about scienter real quick? Sure. And that is, I mean, there's a lot of factors that Judge Pearson looked at that seem to support the other side's argument that you don't have any evidence of state of mind. I mean, this litigation has been going on 18 years. You've never, no one has ever said that they were doing anything like a pump and dump or price maintenance. The one thing you point to as state of mind is, and I agree it's not a maintenance case, but the one thing you point to for state of mind is keeping their jobs. But that's true. That would mean state of mind's proven in every case. No, I think your honor, the best evidence of state of mind here or scienter is the contradiction. Helwig three, the contradiction between the internal documents and the external reporting, the reporting, the best example of that is subprime. Yeah. But then why did they hold all their stock under that theory? I mean, they lost just as much as everyone else. There's a number of cases that say holding your stock when you're trying to reassure the market is consistent with trying to reassure the market. Look, this was a situation where it was essentially, from our point of view, a doubling down situation. The market is going down fast. Everybody's taking hits. Freddie Mac is subject to these exposure from these nontraditional loans, but they keep reassuring the public, don't worry about us. And all of a sudden, if selling stock would have sent a different message. So they're reassuring the public, don't worry about us, because if the housing market turned around, everything would have been fine. So what you're saying, oh, sorry. Does your position on Sienter collapse Sienter with the underlying misleading statements? Well, our position on Sienter, to give the best example, again, I think it's subprime. So they had a subprime definition where they disclosed we have basically no subprime. They disclosed in their disclosure statement 0.1%. That's 0.1%. That wasn't their public definition. It was contrary to their public definition, which was an expansive definition. It was also contrary to their internal tracking of subprime exposure at around 10%. Yeah, but in 2006, they said, look, there's all sorts of definitions for subprime. Here's what we're using. And it was pretty clear from their internal documents, too, they had different ways. They talked about C1 and C2 loans based on the cautionary note. But they had a public definition for subprime they had given. And then they were, of course, all good companies should calculate what other risks exist inside. But they described this as subprime-like risk, as subprime risk, as high-risk subprimes, the internal calculations. So they're using a 0.1% disclosure, which is just based on subprime origination. And that's not what their public definition says. Their public definition has two paragraphs. One talks about all the subprime characteristics. The second one says, we believe that based on lender-type underwriting practice and product structure, the number of loans are at 0.1%. Well, they were only using lender-type subprime origination. They disregarded the underwriting practice and product structure. That's what they were measuring internally. So they're telling people, hey, we're basing this on underwriting practice and product structure. Internally, they developed these tools to measure that precisely because they recognized some subprime was coming in through prime channels. To determine Sienter, you are relying on that, what I'm going to label, that alleged gross disparity. But that's really the only factor that you're relying on for Sienter, except for the fact that they didn't sell their stock? I mean, what else? What am I missing, in other words? The primary factors we're relying on are Hellwood III and Hellwood VI. The divergence between the internal documents and external statements, and the disregard of the most current factual information. Because when you get to Sienter, they knew. They were being told at a February 2007 off-site. They were being told at a March 2007 board meeting, we're taking in subprime risk internally. Our worst 10% is subprime in nature. And then they're reassuring the public, we have no subprime. That's what we believe is misleading. That's what the court in SEC versus Siren recognized. A reasonable investor could find that misleading. We believe it's misleading as well. Now, what the defendants do is they try, and what the court did, was they elevated post hoc testimony, post litigation testimony, over reams of internal documents that talked about this subprime risk that Freddie was facing. And the context, again, is important. This was a, subprime risk was perhaps the most important credit measure at the time. It was a subprime crisis. And what the investors cared about, they didn't care what the label you put on a loan. They didn't care if it came from a subprime originator, which wasn't their public definition. They cared about what risk are you Freddie Mac holding? And that's why when it came out on November 20, 2007, that they in fact had this risk. And they acknowledged it in the information statement that part of the problem was due to their increased purchase of nontraditional loans, they called them. That's why the stock dropped 30%. Thank you. We've taken you above your limit. Unless there are any other questions, we'll hear from your opponents. Thank you very much. May it please the court. Jason Frank from Morgan Lewis on behalf of Freddie Mac. Oprah's case suffers from one fundamental fraud, one fundamental flaw. There was no fraud. Summary judgment entered on multiple grounds on the primary five elements of their claim. To obtain reversal, Oprah's must overturn the grounds on all five elements. It can't overturn even one. The big picture here is that Oprah's had 18 years to develop its case. It received over 80 million pages of documents. It deposed or received transcripts from almost 60 defendants. There were 11 confidential witnesses cited in the third amended complaint. At this time, not one witness supports Oprah's case. And not one document does either. Oprah's tries to set up a dichotomy as if Freddie Mac has the witnesses and it has the documents. It's just not the case. The documents uniformly support the entry of summary judgment, even Oprah's documents. I'd like to make the case simpler for the court. There are four categories of challenge statements here, statements relating to underwriting, relating to risk, relating to subprime loans, and relating to all-day loans. Oprah's, from the beginning of this case, has reduced the number of statements of challenges. Yes, Your Honor. So the one I struggle with the most is the subprime because it seems to me you can have a definitional change in what you're revealing to the public and what you're looking at internally. So you're saying 0.1% to the public. Levy's warning that, I think it's Levy, sent the email saying, wait a minute, we're being way too, whatever he said. He's warning that we shouldn't use that number. Your segmenter model is showing like 8%. Another model is showing 10%. Why isn't that enough circumstantial evidence that a jury should decide if that's a false statement? Well, let me take that in pieces, Your Honor. First, I'd like to begin with Levy's email. What Levy's email actually says is we've come out with our statement in the annual report in 2006. Levy was the head of external reporting, so even though he's not an expert in the mortgage markets, he was involved in the whole process of making that disclosure. He was confident that that disclosure was correct. He was concerned that a statement made by Mr. Siren several weeks later was too summary. So the gist of his email is I'd suggest we look back to the annual report and essentially hew more closely to what was publicly shared. So... But aren't there fact questions whether the reporting of the 0.1% compared to other evidence that suggests that it may be 8%, may be 10% subprime, that that's a fact question where you can spin it one way and they can spin it the other way and a jury should decide? No, for two reasons, Your Honor. First, Freddie Mac was presented with a quandary. What was the quandary? People in the market are talking about subprime loans, but they're using different definitions. Some people, for example, Oprah's expert, believed subprime meant loans with credit scores south of 620. If you believe that, it's simple. Freddie Mac on page 70 of its 2006 annual report says, here's our entire guarantee portfolio, 4% of it is loans with credit scores south of 620. Some people believe that it's the subprime market, that is, lenders who call themselves subprime lenders who use different underwriting standards who during this period are using different product structures, 228s and 327s, not fixed rate loans. So Freddie Mac, concerned that people might be confused, says there's no universal definition, but if you take into account lender type, underwriting practice, and product structure, we don't have a significant amount of those loans. You say that in 2006, and then it seems to me what I'm struggling with is you then give the best number while not disclosing the other numbers. In other words, you're saying it's 0.1, and yet behind closed doors you're saying 8.6 and 10%. Those are drastic differences. I guess I would say two things. First, if you look at the internal documents, the internal reports that are being cited by OPRS, they say things like no subprime loans in the single family guarantee portfolio. That's the February 2007, May 2007 CPMR reports that OPRS cites. Similarly, there is this entire process within the company of considering let's enter the subprime market, and OPRS cites and just spoke to you today about the presentations, the SCT presentation and the board presentation. What did those say? Yes, they have one slide that essentially says we're buying loans that are subprime-like, and when you look at that slide, you see that they're referring to the bottom of Freddie Mac's portfolio and comparing it to the best fixed-rate subprime loans, and the testimony was that no one actually believed we were buying subprime loans, but the whole point of that presentation is should we start buying subprime loans, and there are documents, there are slides in that very presentation that are saying we only participate in the subprime market right now in the retained portfolio where we're buying bonds. We're not currently buying subprime loans. We should. We should enter the subprime market. That's the whole point. So suppose that we were to believe that there is a fact question that should go to the jury on whether there was improper disclosure of the subprime effects. What would be your next argument, and in particular, I would like for my own purposes for you to address the CNTR issue? That's the next natural argument, Your Honor. Indeed. The evidence from the senior management who testified was they believed this was true. There's no contrary evidence that they didn't, and the reports that they were receiving over and over again were showing them that they believed there were no subprime loans in the single-family portfolio other than the T deals, which was this 0.1%. But surely that, in a hypothetical case, that should not be enough, that the individuals involved said, oh, we didn't know about this, right? There can be other kinds of evidence that qualifies as CNTR, and we have the hellway gone bonk from long ago with the nine factors that one should evaluate. So your opponent says it's three and six or whatever. What's your reaction on the hellway factors on CNTR? Well, my reaction on the hellway factors is that they uniformly support that there wasn't the requisite state of mind. So two and six are what is cited by the plaintiff, essentially internal documents. But the internal documents actually support the view that these people had every reason to believe they didn't have subprime loans in the portfolio. And I'd just like to cite a few of those. On subprime risk, you have Exhibit 63, which is the February report saying currently no subprime loans within the portfolio. Exhibit 66 is the same. Exhibit 60 says subprime is $0.1 billion in 2007. I'm citing the plaintiff's documents. Exhibit 114 is the SEC off-site. Exhibit 93 is the board presentation. And I draw your attention to slides 44, 48, and 53. All these documents, document after document, support the good faith belief that they weren't buying subprime loans. So you have the documents, you have the testimony. Yes? A question Judge Moore asked, which is, can we use, if we think there's evidence that the statements were false, in other words, the 0.1 versus the 8%, can we use that as circumstantial evidence of scienter? The problem with using that as circumstantial evidence of scienter is that what you really need to do is compare the statement based on lender type, underwriting practice, and product structure. We don't believe we have a significant amount. And you need to find a document that's contrary to it. Now, what the plaintiff points to is it points to some modeling documents and some offhand documents about caution loans. But none of those statements actually contradict or suggest that the statement's misleading, that based on lender type, underwriting practice, and product structure, it had a significant amount of loans. So they just don't have the evidence. That's the problem for them. And so it's a problem on falsity. It's a problem on scienter. And this is why Judge Moore's point is on point, because they try to collapse it by using the same evidence, which just doesn't get them there. And it's a problem for them at every other stage of the case. They've waived reliance. And under the Noble case that was written, U.S. v. Noble, that Judge Moore wrote some years ago, it's clear that failure to raise an unopening brief is waiver, not forfeiture. On loss causation, the November 20th announcement doesn't mention subprime loans at all. It's not their argument that it's downstream. And they really didn't have to argue it because you never get to it unless you undo the rest. I think it goes too far, Your Honor, because the class certification stage of the case simply is not, it's simply not the merit stage. It's simply not summary judgment. It was incumbent upon them at summary judgment to come forward with evidence in opposition to our evidence. And it was incumbent upon them to raise it in their opening brief. Now, to the extent that they say it's downstream, as you noted, they didn't identify any case law to suggest that that's how it works. But to the extent there is some case law and it would suggest this is forfeiture somehow, forfeiture in a civil case, they cite purely criminal cases. Forfeiture in a civil case, the plain error review, is an exceptional standard, which I don't believe would be available here. They had every opportunity to brief reliance. But they have a problem on all of their other elements too. Loss causation, there's simply no evidence that this caused the loss. They didn't put it before the court. Damages, they got sanctioned because they couldn't even be bothered to come forward with a calculation of their damages. There's just a host of reasons why the fact that there's no fraud here led to the appropriate entry of summary judgment. On the damages issue, their point is that because the district judge ruled in a certain way, there was no point in their trying to come up with a damages theory. But if we overturn the district judge on that, then they would come up with the damages amount. What's wrong with that? There's a number of things wrong with that. The first of it is that it's not consistent with the federal interest in having only one appeal in a case. They essentially just decided to stop working and not comply with their discovery obligations because there was an interim order that they felt precluded them from submitting evidence. But it didn't. There was no evidentiary ruling. There was no evidentiary preclusion. Could they have maintained their price maintenance theory? I'm sorry? Could they have maintained their price maintenance theory? I think that they would have had to put in an opinion on loss causation based on price maintenance. Could they have done that? Or had the district court precluded them from using the price maintenance? It was an interim order. They were not precluded. They essentially gave up. In fact, they rely upon a statement by the district court where she said she wouldn't be likely to change her mind, but they didn't even try to change their mind. And this court arguably invited her, at the last time we were before the court, it invited her to potentially revisit issues, if she would like, but she didn't have to. The OPRs didn't move for reconsideration. They didn't propose any new evidence. They didn't try to explain themselves. And I'd like to address a comment that you made earlier about what did she mean by it proves too much. As my wife would say, this is probably my fault, because when I was before the district court, I said that OPRs' theory of price maintenance goes too far. Why? Because they were trying to argue that on the front end, they didn't need to prove that the statements increased the stock price. So in other words, they didn't need to put in any evidence at all. And on the back end, they didn't need to prove that the revelation of the alleged truth, that the materialization of the risk, moved the stock price. They could just say the stock price moved, and therefore that was enough. And so I argued that their price maintenance theory goes too far, and you can see that in the transcript, that it proves too much. And the judge agreed with that formulation. She didn't reject across the board the theory of price maintenance in all securities cases. She was rejecting what OPRs was trying to do here. So why shouldn't we give them another chance? Well, because there was no fraud, Your Honor. This case has been around for 18 years, and they just couldn't identify any evidence indicating that anyone made a false or misleading statement, that they knew or were reckless in connection with the making of their statements, that any statement caused any losses, or that they had any damages. And that's really why. It's just not fair at this point. This isn't just about a company. There are individuals here, one of whom you may hear from, there are individuals here who've had their reputations tarnished by this fraud case for almost two decades when there really was no fraud. Eighty million pages of documents, and the best they can come up with is some modeling documents that are just trying to assess kind of risk when this company was forthrightly setting forth its risks. If this court really wants to understand whether or not a fraud was committed, it really only needs to read the second quarter 2007 information statement supplement. This comes out a quarter before the revelation of the fraud. You'll see how forthright this company is in sharing with the investing public the risks it's facing, the fact that while credit risk is at a neurohistoric low, credit risks are rising. It's just not the case that there was a fraud, and that's the problem for the plaintiff. And it's really time that this case be brought to an end because it's just not fair to the defendants at this point. Thank you. Unless there are further questions, thank you. Thank you, Your Honors. Good morning, Your Honors, and may it please the Court. James Goldfarb of Davis Wright for one of the individual defendants, Anthony Pizell, the former CFO. Unless you have questions for me at the outstart, let me address the complete absence of a triable fact about Mr. Pizell's state of mind. Quote, it was apparent that Mr. Pizell carefully reviewed Freddie Mac's periodic disclosures because Mr. Pizell, quote, would comment on the document, and, quote, we got the most extensive comments and questions from him and Mr. McQuaid. That's the sworn testimony of Jim Egan. He was Freddie Mac's principal accountant, and it's uncontested. OPRS doesn't even address it. It is also emblematic of the record concerning Mr. Pizell's state of mind. There is only one reason that someone carefully reviews their company's public disclosures and provides extensive comments and questions. They care, and they're striving to get it right. It's the opposite of recklessness, to say nothing of deceptive intent. The district court correctly concluded no triable issue exists about whether Mr. Pizell acted recklessly, a high state of mind for which this court has set a very high bar that Mr. Pizell hurdles with room to spare. Somebody could be reckless if they heard a lot of information, asked a lot of questions, and then acted completely in conflict with that information. There's no evidence that they did hear something that conflicted with what the disclosures were. In other words, every witness to have testified on this said, we do not buy or guarantee subprime loans in our single-family portfolio. Mr. Pizell heard that. He heard that from a number of people, including Patty Cook. Why does that matter? She was the head of single-family business in its own pleading. Can I ask you related to that? Because here's what he says in Q4 2006. We have little to no exposure to the subprime risk layered mortgage products. Am I misunderstanding that? Because then isn't there evidence that, at least with the segmenter model, they were aware of some risk? So the question is, the word that I catch on in your question, Judge, is they. There's no evidence that anyone told Mr. Pizell about the analysis in the bowels of the organization. Freddie Mac has an undisputed, robust, iterative attestation process that the company went through before it issued those disclosures. Just so I understand, I'm sorry if I'm missing it. You're saying that the segmenter model they were running, Mr. Pizell was not aware of? There's no evidence that the outcome of that model was reported to Mr. Pizell. I'm sorry if I'm mispronouncing his name. Go ahead. Right. So one of the attestations that Mr. Pizell and Mr. Siren relied on was that of Patty Cook. Now, she's the head of single-family business. That's the unit where the single-family guarantee portfolio resided. In Oprah's own pleading, Oprah's alleged that Ms. Cook, quote, was responsible for ensuring that the single-family business public disclosures were accurate. Cook was considered an expert on credit risk within Freddie Mac, and the Freddie Mac Disclosure Committee consulted Cook regarding the company's public disclosures concerning subprime, paragraph 21 of the operative complaint. Oprah's cannot make this allegation and criticize Mr. Pizell for relying on Ms. Cook's attestation, among others, to certify the disclosure. There's no evidence that anyone in their attestation said anything other than what was consistent with what Mr. Pizell and Freddie Mac disclosed. In fact, the salient evidence here is what doesn't exist on the record. Nobody raised his hand during the attestation process and said, oh, wait, wait, wait, that's not correct. Who's among the nobodies? Well, it was a gentleman named Anurag Saxena. And who was he? He was the head of Enterprise Risk Management. That might catch your ear because the Enterprise Risk Management Committee reports form a lot of the evidence that Oprah's points to. And the head of that committee that's responsible for those reports never said, that's not right. We can't say that. That's inconsistent. He never raised his hand, except one time. He had a question about something called option-adjusted spreads. Has nothing to do with the issues in this case. That same day that issue was resolved, Mr. Saxena attested that, from his perspective, both the subprime as well as the all-day disclosures were correct. And your red light has been on for a long time, as was true of each and every one of the people arguing in this case. We would request that the court affirm the decision. Thank you. Thank you. A few quick points. In listening to opposing counsel, what I heard was essentially the same errors made by the district court, that they're arguing the inferences in favor of Freddie Mac instead of in favor of Oprah's. And there are disputed facts here. Opposing counsel can cherry-pick a few internal documents that say we have no subprime. There are many, many more that we cited in our omnibus and that we cite in the appeal here. There are dozens and dozens of internal documents that talk about the subprime risks that they were measuring, because they recognized that subprime risk was coming in through prime channels. So at the board meeting, or the off-site, they say, we already purchased subprime-like loans, but with considerably lower fees. The worst 10% of Freddie Mac's flow business were subprime-like loans. That's talking about the risk. The key credit risk indicator, which is a segmenter model that was being used to determine that risk. At the board presentation, Mr. McQuaid and Ms. Cook made a presentation that we already purchased subprime-like loans, but we received considerably lower fees. The levy email, Mr. Frank would have you characterize it one way, but what it says is, we should reconsider making a sweeping statement as we basically have no subprime exposure. He can read it one way, but it's up to the jury to decide. It's not up to the court. When I looked at that email, there was no evidence it went to any of the three individuals. I think there's still three. Sorry if I butchered that. Is there any evidence they saw it? No. Your Honor, with respect to that, no. With respect to the board presentation and the off-site presentation, which clearly in the slide says we're buying subprime and the lowest 10% is subprime, yes. All three of them were at both of those presentations. The 0.1%, which is just based on loans labeled subprime, that's not consistent with their public definition of lender-type underwriting practice and product structure. That's only lender-type at most, subprime originators. That's where they get the 0.1%. Again, the reasonable investor, they don't care what it's labeled. It would be one thing if they said, hey, our definition is it's only subprime originated, if it's only stamped subprime by a subprime originator. Then it's 0.1%, and then the investors and analysts can ask, yeah, but how much subprime risk do you have? That would be the 10%, which is a hundredfold difference, $150 billion of subprime risk that wasn't disclosed. The attestations, again, they're attesting to 0.1% after they attend these meetings where they're told we're already buying subprime. It's the lowest 10% of our portfolio. Again, these are questions for a jury to decide. When I hear there's no evidence in the brief, I saw a lot of the evidentiary void, it sort of boggles the mind because in the omnibus we had over 200 separate documents, over 100 exhibits, some of which had multiple documents. There's a raft of internal documents that show that they knew about this subprime. They knew they were mistakenly misrepresenting Alt-A. They knew they were misrepresenting underwriting, and the district court just took every inference in Freddie Mac's favor in granting summary judgment. I know my time is up. For those reasons, we would ask that you reverse the class certification and reverse the summary judgment so that the case can proceed under the correct legal standards. Thank you, Your Honor. Thank you all for your argument. The case will be submitted.